IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 18, 2005

## PATRICK DESHUN PARIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 247739     Rebecca J. Stern, Judge**

---

**No. E2004-01988-CCA-R3-PC Filed August 16, 2005**

---

Petitioner, Patrick Deshun Paris, filed a petition for post-conviction relief, which was subsequently amended. Following an evidentiary hearing, the petition for post-conviction relief was dismissed. On appeal, Petitioner argues that the post-conviction court erred in not stating its findings of fact and conclusions of law in its order denying Petitioner post-conviction relief. Petitioner also alleges that he received ineffective assistance of counsel at trial and on appeal because his counsel (1) failed to request the removal of juror, Daisy Foster; (2) questioned Marco Brooks about his family's criminal history to the detriment of Petitioner's case; (3) failed to adequately investigate Petitioner's case and prepare for trial; and (4) failed to object to the prosecutor's leading questions during Mr. Brooks' direct examination. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Brandon Raulston, Chattanooga, Tennessee (on appeal), and Jeffrey Schaarschmidt, Chattanooga, Tennessee (at trial), for the appellant, Patrick Deshun Paris.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; William H. Cox, III, District Attorney General; Boyd Patterson, Assistant District Attorney, Lila Statom, Assistant District Attorney General; and Dean C. Ferraro, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

Following a jury trial, Petitioner was convicted of first degree premeditated murder, first degree felony murder and especially aggravated robbery. The trial court merged the two first degree

murder convictions, and the jury sentenced Petitioner to life without the possibility of parole. The trial court sentenced Petitioner to twenty-four years for his especially aggravated robbery conviction, and ordered Petitioner to serve his sentence consecutively to his sentence for first degree murder. On appeal, Petitioner argued that the trial court erred in not suppressing his statement to the police, that the trial court's charge to the jury on criminal responsibility was in error, and that the jury erroneously considered an aggravating factor in determining his sentence for first degree murder. Petitioner's convictions and sentences were upheld on appeal. *See State v. Patrick Deshun Paris, Alias Patrick Deshon Parris*, No. E2002-01514-CCA-R3-CD, 2003 WL 21748682 (Tenn. Crim. App., at Knoxville, July 29, 2003), *perm. to appeal denied* (Tenn. Dec. 22, 2003).

Although Petitioner did not challenge the sufficiency of the convicting evidence on appeal, a brief summary of the evidence supporting Petitioner's convictions is necessary in order to address Petitioner's post-conviction claims.

The body of the victim, Michael Lawrence, was found in a dumpster, wrapped in a sheet and blanket and bound with duct tape and an electrical cord. A white plastic garbage bag covered the victim's upper torso. Marco Brooks was fifteen years old at the time of the killing and lived with the victim, who supported him. Petitioner also lived with the victim. Mr. Brooks testified that the victim earned his living from selling drugs, and Petitioner worked for him.

Mr. Brooks described the sequence of events leading up to the victim's killing as follows. On Sunday night, August 23, 1998, the victim, Mr. Brooks and Petitioner ate a late evening snack at the Waffle House. When they returned home, the victim went into his bedroom at the back of the house and went to sleep. Mr. Brooks played video games in the living room, and Petitioner watched a rental movie in a second bedroom. About two hours later, Petitioner told Mr. Brooks he was going to his mother's house. Mr. Brooks rode with Petitioner. Petitioner stayed in his mother's house about fifteen minutes. As Petitioner drove back to the victim's house, he pulled out a .38 revolver and shot the gun out the open car window. Petitioner told Mr. Brooks that he was going to kill the victim.

After the two men returned to the victim's house, Mr. Brooks continued to play video games, and Petitioner finished watching his movie. About 4:30 a.m., Petitioner walked through the living room with the gun in his hand. He went into the victim's bedroom, and Mr. Brooks heard a gunshot. Mr. Brooks went to investigate and found Petitioner adjusting the knobs on a radio. The victim was lying face down on the bed with a gunshot wound to the back of his head. Petitioner looked at Mr. Brooks and laughed. Mr. Brooks returned to the living room, but heard a second gunshot. When he investigated, Petitioner told him to get a garbage bag to put over the victim's head. Petitioner was wearing rubber gloves.

Mr. Brooks then helped Petitioner dispose of the body. Petitioner removed the money from the victim's pockets. The two men placed the plastic garbage bag over the victim's upper torso and wrapped his body with the top sheet from the bed. Petitioner secured the sheet with duct tape and then covered the body with a blanket. He tied an electrical cord around the middle part of the

victim's body to secure the blanket. The men placed the victim's body in the trunk of the victim's car and disposed of it in a dumpster near some duplex dwellings.

After they disposed of the body, the two men cleaned the house with bleach and a cleanser, and burned the victim's clothes in the backyard. They could not, however, remove all of the blood stains from the mattress. Petitioner took Mr. Brooks to a friend's house, and Mr. Brooks slept until the middle of the afternoon. Petitioner picked him up and they ate dinner, which Petitioner paid for with the victim's money. That night, the two men searched for the victim's drugs and guns and hid the items in a new location.

On cross-examination, Mr. Brooks said that his mother, maternal uncles and the victim were Jamaican, and all of them were involved with the sale of drugs. His mother and uncles were incarcerated on drug charges at the time of the offense. Mr. Brooks said that the victim often carried large amounts of money. Mr. Brooks said that he helped Petitioner dispose of the victim's body because he was scared of Petitioner.

Mr. Brooks said that he had been placed in a group home by the Department of Human Services after Petitioner's arrest. He said he left the group home because he spotted a man named "Dee" on the street near the house. "Dee," also a Jamaican, headed up a drug organization in Cleveland, Ohio and was a friend of the victim's. Mr. Brooks said that his uncle was supposed to talk to "Dee" about the incident. Mr. Brooks, however, said that Petitioner told "Dee" that Mr. Brooks had killed the victim and stolen the drugs in the victim's house, some of which belonged to "Dee." Mr. Brooks' sister gave him money for airfare to Jamaica. Mr. Brooks said he was apprehended by the police in the Miami airport.

Travis Brewer testified that he accompanied Petitioner on Monday morning, August 24, 1998, to purchase a new mattress. Mr. Brewer also helped Petitioner remove the old mattress. He said the house smelled strongly of bleach, and he noticed some blood stains on the mattress. Petitioner told Mr. Brewer that he had been in a fight with the victim. Petitioner said that he was going to steal the victim's money and run away. Mr. Brewer and Petitioner discarded the old mattress on Bailey Avenue. Mr. Brewer said he helped Petitioner because he was afraid of him. After the news about the discovery of the victim's body was broadcast on television, Mr. Brewer's mother and sister took him to the police station to tell the officers about the mattress.

Officer Oakley McKinney found Petitioner's fingerprints on the duct tape around the victim's arms and legs and on the plastic bag covering his torso. The victim's blood was found on the mattress later discovered on Bailey Avenue, some clothing found in the house, a carpet fragment, and on the strings of a mop.

Dr. Ron Toolsie testified that the victim died as a result of two gunshot wounds to the back of the head, either one of which would result in almost immediate death. The trajectory path of the bullets was consistent with the victim lying down and the shooter standing above him.

Lisa Allen testified that her husband worked for the victim selling drugs. She said that the victim hired Petitioner as his bodyguard. On Monday, August 24, 1998, Petitioner came over to her house and told Ms. Allen that the victim wanted his gun, and Ms. Allen gave it to him. Petitioner was driving the victim's car.

Petitioner then visited Doris Wilson, the victim's girlfriend. He told Ms. Wilson that the victim had left town for awhile with two men in a white Ford Expedition, and that the victim had given Petitioner his car keys before he left. Ms. Wilson said that the victim and "Dee" had just returned from Miami where they had purchased a kilo of cocaine. The drugs were scheduled to arrive in Chattanooga during the week following the victim's death.

Kelvin Moore, Petitioner's friend, repeatedly denied that he called Detective Michael Mathis with the Chattanooga Police Department to give him information about the victim's death. Mr. Moore said that he talked to Detective Mathis only because he was promised that his current sentence would be reduced. Mr. Moore first claimed that Detective Mathis told him what to say, and then he said that he learned the details of the victim's killing from jail gossip and television. Eventually, Mr. Moore acknowledged that he told Detective Mathis that Petitioner said he had shot someone, thrown the body in a dumpster, and then cleaned up the victim's house. Mr. Moore said that Petitioner did not tell him the victim's name.

Detective Mathis interviewed Petitioner after his arrest. Petitioner gave several statements identifying Mr. Brooks' uncle as the shooter. In November, 1998, Petitioner called Detective Mathis and told him that he wanted to give Detective Mathis information about some unrelated investigations. During this conversation, Petitioner voluntarily told Detective Mathis that he shot the victim. In Petitioner's direct appeal, a panel of this Court concluded that Petitioner's statement to Detective Mathis was admissible under the parameters of *State v. Anderson*, 937 S.W.2d 851 (Tenn. 1996).

On cross-examination, Detective Mathis acknowledged that several members of Mr. Brooks' family were involved in drug trafficking. Detective Mathis said that it was his understanding that the victim moved to Chattanooga to head up the operations in that location after Mr. Brooks' uncle, "Romeo," was incarcerated.

## II. Post-Conviction Hearing

Petitioner testified at the post-conviction hearing that his trial counsel's assistance was ineffective because he did not hire a private investigator to assist him in preparing for Petitioner's trial. Petitioner said that several witnesses for the defense were not interviewed. Petitioner said that Stephanie White and Jacobia Simpson would have testified that Petitioner and the victim were close friends, and that it was not necessary for Petitioner to rob the victim in order to obtain money. Petitioner also contended that his trial counsel did not adequately investigate Kelvin Moore, and that Mr. Moore lied during his testimony about Petitioner's role in the victim's death.

Petitioner said that his trial counsel should have prevented or objected to Mr. Brewer's testimony that he helped Petitioner buy a new mattress because he was afraid of him. Petitioner also contended that his trial counsel was ineffective because he did not object when the prosecutor asked Mr. Brooks' leading questions during Mr. Brooks' direct examination.

During Mr. Brooks' direct examination, a juror, Daisy Foster, witnessed a man in the audience make a threatening gesture toward Mr. Brooks. The man was removed from the courtroom. Petitioner argues that his trial counsel provided ineffective assistance when he failed to request that Juror Foster be removed from the panel.

Petitioner also challenged trial counsel's failure to appeal the trial court's ruling as to the admissibility of the victim's photograph and the gun discovered in Petitioner's possession when he was arrested, because the gun was not the murder weapon.

Petitioner's trial counsel testified that he met with Petitioner several times before trial. He said that he and Petitioner discussed the various issues that arose during the preparation for trial, and that Petitioner was able to understand and carry on an intelligent conversation about those issues.

Trial counsel said that he tried to locate and interview Petitioner's suggested defense witnesses. He could not find one witness, and the other potential witness adamantly refused to testify because she was afraid of the people connected with the victim. Trial counsel subpoenaed Petitioner's girlfriend, and she appeared in court on the morning the trial began. She disappeared at some point during the day, however, and could not be located.

Counsel said that he did not object to Mr. Brewer's comment that he was afraid of Petitioner because he did not want to draw undue attention to his comment, and he was afraid that an objection would possibly open the door to disclosure of Petitioner's prior convictions. It was also a tactical decision not to object to the prosecutor's leading questions during Mr. Brooks' initial examination because the questions dealt with background information. When the prosecutor began questioning Mr. Brooks about the sequence of events leading up to the victim's death, counsel interposed an objection to the prosecutor leading the witness.

Trial counsel said that it was his understanding that during Mr. Brooks' direct examination, a man in the audience pulled his index finger across his throat as he stared at Mr. Brooks. Counsel learned about the gesture after the man was removed from the courtroom. Juror Foster was visibly shaken by the incident, and counsel asked that she be removed from the panel during a bench conference. Counsel had requested prior to trial that all bench conferences be recorded, but for some reason, a transcript of his request to remove the juror was not prepared. In any event, the trial court conducted a lengthy voir dire of the juror and was satisfied that the incident would not affect her decision in the case.

Trial counsel stated that it was the defense's theory that Mr. Brooks killed the victim because he thought the victim had provided information to the police which led to his uncle's arrest. In addition, counsel attempted to counter the State's theory that Petitioner killed the victim so that he

could take over the Chattanooga drug operations by showing that only Jamaicans were appointed as leaders of the organization. Trial counsel said it was necessary, therefore, to question Mr. Brooks about his family's involvement with drugs and the nature of the organization itself. It was the defense's position that Petitioner did not have a motive to kill the victim because, as a non-Jamaican, he would never have been given a leadership position in the organization.

Trial counsel said that the trial court denied his motion to suppress certain photographs of the victim and the victim's gun which was found at the victim's house on the night that Petitioner was arrested. Trial counsel said that he did not appeal the issues as a matter of tactical strategy. He believed that the strongest issue on appeal was the admissibility of Petitioner's statement to Detective Mathis identifying himself as the shooter.

At the conclusion of the post-conviction hearing, the trial court dismissed Petitioner's petition for post-conviction relief, stating:

> I remember the trial quite clearly. I remember the issue about the juror. I feel satisfied that we discussed it properly, and I do recall that [trial counsel] was concerned and that's the reason we had the hearing to begin with. It may be that it was something that happened over a break or something or around a break time, and it may be something that the attorneys said we need to deal with this before the jury comes back. That's possibly why it didn't get recorded, it may have been the timing of it.
>
> I find that [trial counsel's] representation was more than just effective and adequate. I thought he had a good strategy and that all the decisions he made in the case were consistent with the strategy and supported his strategy. I don't find any merit in the petition.

### III. The Trial Court Failed to Make Findings of Fact and Conclusions of Law in its Order Denying Petitioner Post-Conviction Relief.

Petitioner argues that the post-conviction court failed to make the requisite findings of fact and conclusions of law mandated by Tennessee Code Annotated section 40-30-211(b). Upon the conclusion of a post-conviction hearing, the court is required to set forth all of the grounds presented by the petitioner and its findings of fact and conclusions of law as to each ground in a written order or memorandum. Tenn. Code Ann. § 40-30-211(b). The purpose of this requirement is to facilitate appellate review of the post-conviction court's decision. *See State v. Swanson*, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984) (analyzing the requirement that the post-conviction court enter a written order containing findings of fact and conclusions of law for each issue presented by the petitioner under prior law). This Court has previously concluded that reversal is not required if the record is otherwise adequate for review. *Randy Caldwell and Stevie W. Caldwell v. State*, No. M2001-00334-CCA-R3-PC, 2002 WL 31730875, *13 (Tenn. Crim. App., Nashville, Dec. 4, 2002), *perm. to appeal denied* (Tenn. May 12, 2003); *State v. William Makransky*, No. E2000-00048-CCA-R3-CD, 2001

WL 725303, *12 (Tenn. Crim. App., Knoxville, June 28, 2001), *perm. to appeal denied* (Tenn. Jan. 5, 2001).

Although the post-conviction court did not set forth its findings of fact and conclusions of law as to each issue, the post-conviction court found as to all claims of ineffective assistance of counsel that Petitioner's trial counsel's assistance was "more than just effective and adequate." The post-conviction court further found that counsel's decisions were guided by a sound trial strategy and that his decisions were consistent with that strategy. The trial court implicitly accredited counsel's testimony and discredited Petitioner's testimony. Based on the testimony and the evidence produced at the evidentiary hearing, the post-conviction court implicitly concluded that Petitioner had failed to establish either that his counsel's conduct was deficient or that he suffered any prejudice. Although clearly sparse, the post-conviction court's findings of fact and conclusions of law are sufficient (although barely so) to allow for proper appellate review. Petitioner is not entitled to relief on this issue.

## IV.  Post-Conviction Claims

### A.  Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to de novo review. *Id.*; *Burns*, 6 S.W.3d at 461.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the

components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

## B. Removal of Juror Foster

Petitioner argues that trial counsel's assistance was ineffective because he failed to request the trial court to remove Juror Foster from the panel after she reacted with alarm over a gesture made by a spectator during Mr. Brooks' direct testimony. Petitioner contends that there is nothing in the record to support trial counsel's assertion that he did ask the trial court to remove the juror.

This argument essentially goes to the credibility of the witnesses. During a lengthy voir dire, Juror Foster said that she knew the man who made the gesture, and that his conduct "kind of frightened" her. Her main concern appeared to be that she wanted the trial court to know she knew the man. Trial counsel asked Juror Foster if the incident was "going to influence [her] ability to find someone guilty or not guilty based on what [she] saw in the courtroom." Juror Foster replied, "[n]o, not – huh uh, I just didn't like the way he was looking that's all." The post-conviction judge, who also presided over Petitioner's trial, specifically accredited trial counsel's testimony that he timely raised concerns over the juror's reaction to the incident. Petitioner bears the burden of establishing his claims for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). Based on our review, we find that petitioner has failed to demonstrate that his trial counsel's conduct was deficient in this matter. Petitioner is not entitled to relief on this issue.

## C. Inquiry into Mr. Brooks' Background

Petitioner argues that trial counsel's assistance was ineffective because he brought out during Mr. Brooks' cross-examination that Mr. Brooks and his family were involved with drugs. Petitioner contends that the line of questioning might have been appropriate if Mr. Brooks was also on trial, but he testified that if trial counsel had "stuck with the facts or what had actually happened into [sic] the house, it probably would have worked out better."

Trial counsel testified that it would have been difficult to successfully portray Mr. Brooks as the shooter without going into his background. Petitioner's fingerprints were on the duct tape used to bind the victim's body. Trial counsel stated, "it was always [Petitioner's] position, and our position at trial, . . . that Petitioner helped [Mr. Brooks] dispose of the body because he was afraid of what the drug dealing Jamaican mafia would do to him if he didn't [follow the] marching orders from Marco Brooks." His strategy also was to show that Petitioner had no motive to kill the victim because he would not have been permitted to assume a leadership role in the organization. In light of the facts and circumstances existing at that time, the evidence does not preponderate against the post-conviction court's findings that trial counsel had developed a good trial strategy based on the evidence, and that his decisions as to how to conduct Mr. Brooks' cross-examination supported his strategy. Petitioner is not entitled to relief on this issue.

## D. Failure to Investigate and Prepare for Trial

Petitioner argues that his trial counsel did not meet with him an adequate number of times before trial. Trial counsel said that he could not remember exactly how many times he met with Petitioner, but he met with Petitioner once a week or every other week. He described Petitioner as intelligent and capable, and said that he was an active participant in the meetings. Petitioner acknowledged at the post-conviction hearing that his trial counsel met with him and that trial counsel's strategy was "fair." His specific argument on this issue speaks more to trial counsel's failure to adequately investigate witnesses.

None of the witnesses Petitioner claims should have been called to testify at trial testified at the post-conviction hearing. Trial counsel described his difficulties in locating witnesses, or, if located, getting them to testify. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case; (b) a known witness was not interviewed; (c) the failure to discover or interview a witness inured to his prejudice; or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.*

Petitioner suggested that Stephanie Wright and Jacobia Simpson would have testified that he and the victims were friends, and that there was no need for Petitioner to rob the victim because the victim gave him money. The State's witnesses, however, acknowledged that the victim and Petitioner were often seen together. Mr. Brooks testified that the victim gave Petitioner money, bought him things, and took him out to dinner. Based on our review, the evidence does not preponderate against the trial court's finding that trial counsel's assistance was effective and more than adequate. Moreover, Petitioner has not shown that he was prejudiced by the failure of his suggested witnesses to testify at trial. Petitioner is not entitled to relief on this issue.

## D. Failure to Object to Leading Questions

Petitioner contends that his trial counsel's conduct was deficient because he failed to object to the prosecutor conducting his direct examination of Mr. Brooks, who was seventeen-years-old at the time of trial, through the use of leading questions. Petitioner does not cite any portion of the trial transcript in support of this claim. Ordinarily, failure to make appropriate citations to the record waives an issue for appellate review. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Regardless of waiver, we find that Petitioner has not shown that his trial counsel's decision not to object to leading questions was deficient, or that he was prejudiced as a result.

Trial counsel testified that he was aware that some of the prosecutor's questions were leading at the start of Mr. Brooks' direct examination. Petitioner, on the other hand, submits without citation

to authority that there is no justification for allowing the prosecutor to employ leading questions during a witness's direct examination in a first degree murder trial.

Rule 611(b) of the Tennessee Rules of Evidence states that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop testimony." Trial counsel said that he did not object to some of the prosecutor's early questions because the questions dealt only with the development of background information, and he did not want to leave the jury with the impression that he was trying to prevent them from hearing evidence. When the prosecutor began asking Mr. Brooks about the events immediately prior to the shooting of the victim, trial counsel objected, stating, "I am going to object to his, Your Honor. I am going to start objecting to leading. I think I have been very liberal in not objecting so far." The trial court then instructed the prosecutor not to ask leading questions.

Trial counsel's decision not to interrupt Mr. Brooks' examination was a tactical strategy developed in light of the facts and circumstances surrounding that particular witness's testimony and the case as a whole. We will not at this point engage in hindsight to speculate whether or not that strategy was wise. *See Hellard*, 629 S.W.2d at 9. Moreover, Petitioner does not allege any specific prejudice as a result of trial counsel's conduct other that a general submission that the results of his trial would have been different if trial counsel had objected sooner to the prosecutor's line of questioning. We conclude that Petitioner has failed to establish that his trial counsel's conduct was deficient, or that he was prejudiced. Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE